**Lucille NYDEGGER, Appellant,**

v.

**Mrs. Sally MASON, Respondent.**

No. 45821.

Supreme Court of Missouri,

Division No. 2.

July 14, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 8, 1958.

Byron A. Roche, St. Louis, Carter, Bull & Baer, St. Louis, of counsel, for plaintiff-appellant.

Chapman & Chapman and Thomas W. Chapman, St. Louis, for respondent.

LEEDY, Judge.

Appeal by plaintiff, Lucille Nydegger, from an adverse judgment rendered by the Circuit Court of the City of St. Louis in conformity with the verdict of the jury in this, her action against Sally Mason for damages for personal injuries. The petition having prayed for the recovery of $42,700, that sum, in the circumstances just related, represents the "amount in dispute" on this appeal; hence, under Art. V, § 3, Const. of Mo. 1945, V.A.M.S., this court has jurisdiction.

The automobile collision out of which this action arises occurred June 25, 1954, at about 8:30 P.M. (daylight saving time) at or near the intersection of Newstead and Enright Avenues in the City of St. Louis. Inasmuch as the errors assigned on this appeal extend only to the form of the so-called "contributory negligence" and "sudden emergency" instructions on behalf of defendant (numbered) # 3 and # 7, respectively), an abbreviated outline of facts will suffice for the purpose of determining the issues presented.

Newstead runs north and south, Enright east and west. Plaintiff and defendant were traveling in opposite directions on Newstead, the plaintiff being southbound and the defendant northbound. Automobiles were parked along the east and west curbs of Newstead both north and south of the intersection, leaving two lanes open, one for southbound and the other for northbound traffic.

The respective versions of the affair by plaintiff and defendant leave the precise point of collision in much doubt and uncertainty. Both parties were obviously quite inaccurate in estimating distances, to say nothing of the sharp and direct conflict in their testimony as to whose car was in motion at the time they collided.

Plaintiff testified that in proceeding south on Newstead she obeyed the "boulevard stop" at Enright as she approached and got even with the sign at the northwest corner of the intersection, then continued southward into the intersection, traveling at 5 to 10 miles per hour. There was a line of traffic northbound. As she headed into the intersection she saw the defendant's car (which was then "just across the intersection") headed north and traveling over the center line on the west (or wrong) side of Newstead; in other words, it was traveling north in the southbound lane. When she saw defendant's car thus traveling, she stopped and blew her horn, and after doing so, the other car (defendant's) struck hers; it did not change its course of travel at any time after she first saw it until the time of

the collision—"it kept coming northbound." Plaintiff's car was described as having been struck to the left of center on the front. Plaintiff was quite positive that her car was still partially in the intersection when struck, her estimate being that three-fourths of her car had cleared it. She denied that she had gotten through, or that she was actually 10 or 15 feet to the south of, the intersection when struck.

Plaintiff's case was submitted on two charges of primary negligence, i. e., in defendant having crossed to the left of the center line on Newstead in attempting to overtake and pass the vehicle ahead of her, and in operating her automobile without adequate and sufficient brakes.

Defendant's version was, in substance, this: That as she proceeded north on Newstead and when about "midway between Delmar and Enright" (Delmar being one block south of Enright), in slowing for the boulevard stop at Enright, she noticed that she had no brake. (She had braked and stopped without any difficulty at the red light at Washington Avenue, the next street south of Delmar.) There was a string of cars proceeding northward ahead of her, which cars were slowing for the boulevard stop at Enright, and when she discovered the want of a foot brake she "pulled out a little bit to the left and pulled on her emergency brake, cut off the ignition and stopped." She saw the automobile of the plaintiff approaching as she, the defendant, stopped her car, which stop was somewhere between 10 and 20 feet south of Enright," at which time plaintiff's car was "across [to the north of] Enright—whatever that width is * * * I imagine about 50 feet * * * plus the distance I was south of Enright." She testified that plaintiff's car was then in motion, but she could not estimate its speed; she could see that the driver of it "shot her eyes down to the floor board and she never looked up." From the time defendant first saw the plaintiff until the time of the collision, "she [plaintiff] never looked up until she hit. When she hit that car, then she raised her eyes and screamed. I was screaming all the time, the dog was barking, and somebody was yellin' 'stop.'" Defendant further testified that she attempted to sound her horn but couldn't because she had turned off the ignition.

On cross-examination defendant testified that she applied her foot brake when about in the middle of the block south of Enright, and that she traveled probably 20 feet after she first started to slow down until her car was brought to a halt; that when her car was stopped it was 10 to 20 feet south of the intersection, and the collision occurred at this point. She further testified that she stopped in such position that northbound cars were able to and did proceed to pass her to her right, and also there was a car coming southbound ahead of plaintiff's car, and that that car went by her "because I wasn't that far out that traffic couldn't get by on the left * * * I was in the middle; they could pass me either way." She also stated that when her car was stopped in the middle of the street it was facing north, "the head of it was a little bit west. It wasn't true north." In other words, it was "cocked a little bit to the left." Defendant turned off the ignition as she stopped and "right then" saw the plaintiff, who was then "north of Enright," approaching. Defendant made no effort to start her automobile or to back it up. She estimated the interval of time elapsing between the moment she stopped her car and the time it took plaintiff to come across the intersection and run into the front end of her car as being "a minute or two; it seemed an eternity."

Defendant's instruction No. 3, of which plaintiff complains, reads as follows:

"The Court instructs the jury that if you find and believe from the evidence that on the occasion mentioned in the evidence there was a time when the plaintiff was driving her car from the north on Newstead Avenue, when defendant driving a car northwardly on Newstead Avenue, saw the automobile of the plaintiff coming toward her from the north side of Enright Avenue,

and if you further find that thereafter defendant stopped her car, and if you further find that plaintiff in the exercise of the highest degree of care on her own part would, could and should have swerved or stopped her car and that by so swerving or stopping her car she would have avoided a collision with the automobile being driven by defendant, and that plaintiff failed to so swerve or stop her car, and if you further find that such failure on the part of the plaintiff was negligence, and that as a direct result thereof said collision occurred, or, if you further find that in the exercise of the highest degree of care plaintiff would have seen the automobile of the defendant in ample time thereafter in the exercise of such care to have swerved her car or stopped the same and so would have avoided said collision, and if you further find that plaintiff failed to exercise such care and thereby failed to see the automobile of the defendant in front of her, and that such failure on the part of the plaintiff was negligence, and that as a direct result thereof plaintiff failed to swerve her car or stop the same to avoid said collision and it thereby occurred, then your verdict should be in favor of defendant and against the plaintiff in this case, and you are instructed that this is true even though you may find and believe from the evidence that the defendant was herself negligent at said time and place."

▮▮▮▮ Plaintiff's first ground of attack on this instruction as being prejudicially erroneous is that it placed a greater duty on her than the law required, in that it predicated liability upon her failure to swerve or stop her vehicle upon the mere appearance of the other vehicle prior to the time that there was probability or likelihood of danger of a collision and any duty on her part to act; in other words, it hypothesized a breach of duty to take precautionary steps without requiring the jury to find the basic fact on which such duty rested, i. e., that she knew or should have known of the danger or imminence of a collision between the two vehicles. This criticism, while not expressly so stated, is

apparently directed against the first alternative submitted by the instruction because the second amounts to a charge of failure to keep a proper lookout ahead and laterally, and it has been held that an omitted hypothesis of the nature of which plaintiff complains is but an evidentiary circumstance, and not an essential element of a case predicated upon primary negligence in failing to keep such a lookout. Horrell v. St. Louis Public Service Co., Mo., 277 S.W.2d 612. Therefore, error predicated on such omission could not be sustained under the second alternative of the instruction.

Plaintiff relies on Stakelback v. Neff, Mo.App., 13 S.W.2d 575, 577 (and the hereinafter cited cases which follow it), where an instruction very much akin to the one here challenged was held to be reversibly erroneous for the omission of the hypothesis in question. The court there said: "Counsel for defendant submit that the above instruction is fatally erroneous, in that it placed a greater duty upon defendant than that required of him by law. It will be observed that the jury was directed under this instruction to find defendant guilty of negligence if, as he approached and entered Lucas avenue, he saw, or by the exercise of the highest degree of care could have seen, Foley's automobile being driven southeastwardly on Lucas avenue and across Jefferson avenue, and failed to stop, diminish the speed of, or change the course of, his own car. The precise contention is that defendant was thus incorrectly charged with the duty of stopping, slackening the speed of, or swerving, his automobile, upon the mere appearance of the other car, whether the facts and circumstances were such as to give him reason to believe that a collision was imminent, or not.

"We cannot escape the conclusion that defendant's complaint in this respect is well founded. Even though it is true that this instruction counts upon primary negligence, and not the humanitarian doctrine, there was nevertheless no duty upon de-

fendant to take any of the precautions hypothesized therein, unless there was apparent danger of a collision, which basic fact the jury was not required to find. It cannot be said that the law imposes the duty upon the driver of an automobile, upon approaching and entering an intersecting street, to stop, decrease the speed of, or change the course of, his car, merely because he sees another automobile in the street ahead of him. To the contrary, such duty to act would clearly not arise, unless the exercise of due care upon the part of the driver would lead him to believe that otherwise a collision would occur." See, also, Rosenkoetter v. Fleer, Mo., 155 S.W. 2d 157, 159; DeVoto v. St. Louis Public Service Co., Mo.App., 238 S.W.2d 66, 72–73; Greenwood v. Bridgeways, Inc., Mo. App., 243 S.W.2d 111, 114; Rayburn v. Fricke, Mo.App., 243 S.W.2d 768; Burke v. Renick, Mo.App., 249 S.W.2d 513, 517; Douglas v. Whitledge, Mo.App., 302 S.W. 2d 294, 303 (concurring opinion of Stone and Ruark, JJ.). Nor do we find anything in the record upon which to distinguish the Stakelback case, as has been done in such cases as Taylor v. Alexander, Mo., 283 S.W.2d 588, 590–591; Witt v. Peterson, Mo., 310 S.W.2d 857, 861, and DeVoto v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 355.

■ On the other hand, defendant argues plaintiff was guilty of contributory negligence as a matter of law because, says her brief, "the evidence is undisputed that defendant's automobile was across the center line and in this dangerous position when appellant saw it * * * far enough away (50 to 70 feet) to have brought her car to a dead stop." This argument is not tenable if for no other reason than that it overlooks the defendant's own testimony that in the position in which she stopped her car, there was room for cars to pass hers, either northbound or southbound, and that, in fact, the southbound one preceding plaintiff's did pass without colliding or other untoward consequence. In this situation it cannot be said that plaintiff owed the duty of stopping or swerving until in the exercise of the highest degree of care on her part, she knew or should have known that a collision would likely result unless such precautionary measures were taken, and this hypothesis the instruction fails to submit, thus demonstrating, we think, that defendant's own testimony in the respect just mentioned pinpoints the validity of plaintiff's complaint. The principle applied in Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, sanctioning in certain instances the submission of the ultimate issues of negligence and proximate cause by reference to facts and circumstances shown by the evidence without specific hypothesization thereof, does not, under the express ruling of that case, apply where, as here, the evidence presents two wholly divergent sets of essential facts.

■ Plaintiff further contends the instruction is fatally defective for the reason that it fails to submit the hypothesis of plaintiff's ability to have stopped or swerved *with safety to herself, her passengers and other vehicles*. The authorities relied on by plaintiff have reference exclusively to humanitarian doctrine submissions. Spoeneman v. Uhri, 332 Mo. 821, 60 S.W. 2d 9, 11, 13; Borgstede v. Waldbauer, 337 Mo. 1205, 88 S.W.2d 373; Martin v. Lingle Refrigeration Co., Mo., 260 S.W.2d 562, 568; Schneider v. St. Louis Public Service Co., Mo., 238 S.W.2d 350, 354. The necessity for the submission of such hypothesis in that type of case arises from the nature and theory of that doctrine, one of the essential elements of a cause of action thereunder being that the defendant had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others. Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482, 484. In Spoeneman v. Uhri, supra [332 Mo. 821, 60 S.W.2d 11], it is stated: "Neither should he be convicted of negligence under the humanitarian doctrine if he could have avoided injuring the appellant only by inflicting injury upon himself or third parties, or even only by exposing

himself or them to unreasonable hazard. * * * We do not mean to say that, if a defendant's prior carelessness precipitates such an emergency, he will always be excused from liability merely because he could not thereafter avert the casualty without undue hazard to himself or others. He would be liable, if the plaintiff's petition is bottomed on that antecedent negligence." (Emphasis ours.) Plaintiff's contention in this connection is overruled.

The other assignment of error goes to the matter of the form of defendant's "sudden emergency" instruction. It is not contended that the evidence did not warrant the giving of an instruction on that subject. The instruction is certainly not a model of good form, but whether it is prejudicially erroneous or not need not be determined because on retrial it can be easily redrafted in the light of the objections presently urged against it and made invulnerable to attack.

For the error noted with respect to the giving of instruction No. 3, the judgment is reversed and the cause remanded.

All concur.